[Cite as *State v. Butler*, 2013-Ohio-5397.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

      Plaintiff-Appellee,                      :

                                          No. 13AP-360

v.                                                     :          (C.P.C. No. 10CR-09-5225)

Etonate D. Butler,                                     :           (REGULAR CALENDAR)

      Defendant-Appellant.                     :

---

D E C I S I O N

Rendered on December 10, 2013

---

*Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee.

*Yeura R. Venters*, Public Defender, and *David L. Strait*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

O'GRADY, J.

{¶ 1} Defendant-appellant, Etonate D. Butler, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of two counts of rape, kidnapping with a specification, and robbery. For the following reasons, we affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Butler was indicted on two counts of rape, in violation of R.C. 2907.02, one count of kidnapping with a specification, in violation of R.C. 2905.01, one count of aggravated robbery, in violation of R.C. 2911.01, and two counts of robbery, in violation of R.C. 2911.02. He pleaded not guilty, and the matter proceeded to a jury trial.

{¶ 3}   At trial, L.R., age 21, testified about an incident that occurred on February 4, 2010, when she was 17 years old.  That evening, she got off the bus to walk home and sensed someone walking behind her.  A man L.R. had never seen before caught up to her and tried to get her phone number.  L.R. told him she did not have a phone, and he suggested they go to a store to get a pen and paper so he could give his number to her.  L.R. declined, but then asked the man if he knew "where some marijuana was at."  (Tr. 39.)  The man said he had some.  L.R. told the man on second thought she did not need any.  She continued to walk home, and the man asked if she wanted to "smoke one."  (Tr. 40.)   When L.R. declined, the man pulled out a knife, held it up to her body, and instructed her to be quiet and come with him.  L.R. described the knife as being about 12 inches long.  The man forced her to enter the side door of a little green abandoned house on Kelton Avenue.  Once inside, the man unbuckled his pants, pulled them down, and told her to get on her knees and perform oral sex.  L.R. complied and less than five minutes later, the man said: "[t]urn around, pull your pants down, and bend over."  (Tr. 48.)  He then proceeded to have vaginal sex with her.

{¶ 4}   Then they "heard a light" flickering by the door they had entered.  (Tr. 49.)  The man ordered her to pull up her pants and exit the house through a window.  She did so and tried to walk towards the street, but the man forced her back into the house since no one else entered it after they climbed out the window.  The man took her MP3 player and cash.  Then, "out of nowhere," he tried to stab her in the stomach.  (Tr. 54.)  She reached for his hand, and L.R.'s finger was cut as they struggled over the knife.  The man ultimately let her go, and she went home where a family member called 911 for her.  L.R. then went to the hospital where personnel gave her stitches and completed a rape kit.

{¶ 5}   On cross-examination, L.R. admitted she told Detective David Bobbitt of the Columbus Police Department she agreed to go to the man's residence on Kelton Avenue to smoke.  L.R. also admitted she told the detective before the man forced her to perform oral sex, he unsuccessfully attempted to perform vaginal sex.  L.R. testified that was the correct sequence of events and suggested she forgot to mention that detail on direct examination because the incident happened three years ago.  L.R. acknowledged she told a nurse and the detective she had no consensual sex with anyone during the 72 hours

before this incident. She denied knowing whose DNA was found in a semen stain on her pants.

{¶ 6} The state presented evidence that appellant's DNA was on the vaginal swabs in the rape kit and on L.R.'s underwear. His DNA was also in a mixture of DNA found in a semen stain on L.R.'s pants. However, this stain also included "minor DNA types" from an unknown male contributor. (Tr. 118.) L.R.'s blood was on a piece of wood and a metal nut found inside the abandoned house. Police recovered L.R.'s cigarette pack and MP3 headphones from a room in the house. In the same room, police observed blood splatter on the floor.

{¶ 7} Tracy White, a certified nurse practitioner, testified she interviewed and examined L.R. She photographed and sutured an injury on L.R.'s hand. White collected swabs for the rape kit but noted no injuries to L.R.'s vaginal and rectal areas. According to White, L.R. told her she was "going down the street to smoke some weed" before the incident happened. (Tr. 145.)

{¶ 8} Detective Bobbitt testified about various aspects of his investigation. He explained that while L.R. gave a physical description of the man who raped her, police did not have a known suspect until they obtained DNA test results. Then he showed L.R. a picture of appellant, and she said, "That looks like the person that raped me." (Tr. 174.) At that point, he requested an arrest warrant for appellant. According to Bobbitt, L.R. told him before appellant forced her into the abandoned house, she agreed to go to his residence on Kelton Avenue to smoke marijuana. Bobbitt also testified when he interviewed L.R., "she was unable to describe the knife to my knowledge."

{¶ 9} Appellant testified he met L.R. online through "UrbanChat or Facebook or something." (Tr. 215.) One day she called him and said she was on the bus and asked him to meet her. He did, and they went to her friend's house and had consensual sex. Afterwards, he got up and left. He denied taking her belongings. Appellant explained at that point in his life, he regularly met girls online, had sex with them, and dismissed them. Appellant admitted he told Detective Bobbitt he did not know L.R., he did not know her real name, and did not recognize the photo of her of the detective showed him. When he later got a "better picture" of L.R., he recognized her. (Tr. 219.)

{¶ 10} The jury found appellant not guilty of aggravated robbery but guilty of the remaining charges. The trial court sentenced him to nine years in prison for each of the rape and kidnapping counts and ordered him to serve the sentences concurrently to each other. The court found the robbery counts (Counts 5 and 6) merged, and at the state's election sentenced appellant on Count 5 to six years in prison. The court ordered appellant to serve the sentence on Count 5 consecutive to his sentences on the other counts. Thus, the court imposed a 15-year aggregate prison sentence. This appeal followed.

## II. ASSIGNMENT OF ERROR

{¶ 11} Appellant appeals and presents this court with one assignment of error for review:

> The judgment of the trial court is against the manifest weight
> of the evidence.

## III. DISCUSSION

{¶ 12} Under his first assignment of error, appellant contends his convictions are against the manifest weight of the evidence. "[T]he criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). This discretionary authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 13} "Furthermore, a defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was offered at trial." *State v. Bailey*, 10th

Dist. No. 12AP-699, 2013-Ohio-3596, ¶ 23, citing *In re C.S.*, 10th Dist. No. 11AP-667, 2012-Ohio-2988, ¶ 27. "The trier of fact is free to believe or disbelieve any or all of the testimony presented" because it is "in the best position to take into account the inconsistencies in the evidence, as well as the demeanor and manner of the witnesses, and to determine which witnesses are more credible." *Id.* Thus, although an appellate court sits as a "thirteenth juror" when it considers a manifest-weight argument, "it must also give great deference to the trier of fact's determination on the credibility of the witnesses." *Id.*

{¶ 14} Appellant implicitly concedes the state presented evidence going to each of the essential elements of the offenses for which he was convicted. However, he argues the record contains several factual inconsistencies that render L.R.'s credibility so suspect that her testimony "falls short of what the law requires to support a conviction." (Appellant's brief, at 13.) Specifically, appellant complains L.R. was unable to describe the knife in her interview with Detective Bobbitt, but during trial testified it was 12 inches long. Appellant also claims L.R. told a nurse and the detective she agreed to go to appellant's house to smoke marijuana "but during [L.R.'s] trial testimony she denied using marijuana." (Appellant's brief, at 12.) Appellant also argues L.R. denied having consensual sex with anyone else in the 72 hours before the incident, but DNA analysis showed the presence of another man's semen on her jeans. Finally, appellant highlights the fact that in her police interview, L.R. claimed appellant unsuccessfully attempted vaginal sex before he forced her to perform oral sex. But on direct examination, L.R. did not mention that failed attempt. Appellant concludes L.R. gave "two completely different accounts of the event." (Appellant's brief, at 13.)

{¶ 15} Appellant's arguments are not persuasive. The presence of DNA of an unknown male in a semen stain on L.R.'s pants does not automatically deem she was untruthful about having sex within 72 hours before this incident. L.R. suggested she forgot to mention the initial failed attempt at vaginal rape on direct examination because the incident happened three years ago. The jury was free to believe that explanation. Finally, L.R.'s ability to describe the length of the knife and whether she agreed to go to appellant's house to smoke marijuana before he forced her into the abandoned house are relatively minor details in the series of events L.R. described. The jury was aware of the

inconsistencies and could use them to evaluate her credibility.  In spite of them, the jury chose to believe L.R.'s version of events and disbelieve appellant's version.

{¶ 16} Appellant points to no evidence L.R. ever waivered in her claim that the man she encountered on the street forced her into an abandoned house by knifepoint, ordered her to engage in oral and vaginal sex, took her property, tried to stab her in the stomach, and ultimately cut her finger in a struggle for control of his knife.  In addition to L.R.'s testimony, the state presented evidence that appellant's DNA was in L.R.'s vaginal swabs, on her underwear, and her jeans.  Police found L.R.'s blood and belongings in the abandoned house.  And the state presented evidence that confirms the injury to L.R.'s hand.

{¶ 17} Reviewing the record as a whole, we cannot say the evidence weighs heavily against the convictions, the trier of fact clearly lost its way or a manifest miscarriage of justice has occurred.  The jury was in the best position to determine the credibility of the testimony presented, and we decline to substitute our judgment for that of the jury in this case.  Accordingly, we overrule the sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT, P.J., and CONNOR, J., concur.

————————